IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JONATHAN LAZUKA, | ) | Case No. 1:24-cv-01873 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.    Introduction

Plaintiff, Jonathan Lazuka ("Lazuka"), seeks judicial review of the final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. Lazuka raises two issues on review of the Administrative Law Judge's ("ALJ") decision, arguing:

1.    The ALJ erroneously failed to comply with the Order of Remand when he failed to properly evaluate the opinion of the treating neurologist, Dr. Kristen Smith, and,

2.    The ALJ committed harmful error, when at Step Three of the Sequential Evaluation, he failed to find, during the relevant closed period of time, that Plaintiff's seizures did not satisfy the criteria Listing 11.02.

 (ECF Doc. 6, p. 1). This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3) and Local Rule 72.2(b). Because the Administrative Law Judge failed to apply proper legal standards in evaluating the opinion of neurologist Dr. Kristen Smith, I recommend that the Commissioner's final decision denying Lazuka's application for DIB be vacated and that Lazuka's case be remanded for further consideration of Dr. Smith's opinion.

1

## II.        Procedural History

On April 10, 2019, Lazuka protectively filed a Title II application for DIB alleging his disability began December 31, 2018. (Tr. 177). The claim was denied initially and upon reconsideration. (Tr. 95, 110). Lazuka filed a written request for hearing before an ALJ on February 21, 2020. (Tr. 128-29). Lazuka, with counsel and a vocational expert ("VE"), testified before an ALJ on August 14, 2020. (Tr. 31-81).

On July 27, 2021, the ALJ issued a written decision finding Lazuka not disabled. (Tr. 10-30). The Appeals Council denied his request for review on June 13, 2022, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-6). On August 3, 2022, Lazuka filed a Complaint in this Court seeking review of the adverse decision of the Commissioner (Tr. 1033-37), and on January 3, 2023, the Court accepted the parties Joint Stipulation to Remand to Commissioner, thereby remanding the matter back to the Commissioner for further proceedings. (Tr. 1025-26).

Lazuka was scheduled for a hearing before an ALJ on January 31, 2024, but failed to appear. (Tr. 1015-25). He was scheduled for another hearing on June 27, 2024, and both he, with counsel, and a VE testified. (Tr. 976-1014). At that hearing counsel for Lazuka requested the ALJ consider a closed period of disability, December 31, 2018 through September 2023, as Lazuka had returned to full time employment. (Tr. 983). On August 23, 2024, the ALJ issued a written decision finding Lazuka not disabled. (Tr. 955-75). Lazuka timely instituted this action on October 28, 2024. (ECF Doc. 1).

**III.      Evidence**

**A.      Personal, Educational and Vocational Evidence.**

Lazuka was 36 years old on the alleged onset date. (Tr. 24). He has at least a high school

education. (*Id.*). In the original decision issued on July 27, 2021, the ALJ found Lazuka had past

relevant work as a sales representative – vending and coin machine, DOT #275.357-050, SVP 5,

light exertion; sales agent – business services, DOT #251.357-010, SVP 5, light exertion;

vending machine repairer, DOT #639.281-014, SVP 5, medium exertion, performed at light;

manager – brokerage office, DOT #186.117-034, SVP 8, sedentary exertion; and computer

assistance hardware analyst, DOT #033.167-010, SVP 7, sedentary exertion. (*Id.*). On remand,

however, the ALJ found that he had no past relevant work. (Tr. 967).

**B.      Relevant Medical Evidence**

Records submitted from the Atrium Medical Group, Inc. show that on October 24, 2016,

Lazuka presented for a new patient visit following a recent hospitalization for a right peripheral

pulmonary embolism ("PE") discovered in the post-operative phase after a calcaneal fracture and

open reduction internal fixation ("ORIF"). (Tr. 598). Previously, after several days in the

hospital, Lazuka was released with prescriptions for Percocet, Xanax, and Ambien. (*Id.*). At the

new patient office visit, Lazuka appeared in a walking boot and reported that the pain was much

worse. (*Id.*). At a subsequent visit on May 3, 2017, Lazuka reported ongoing right ankle pain and

was assessed with generalized anxiety disorder ("GAD"); left ankle degenerative joint disease;

recent PE; status-post right calcaneal fracture, routine healing; and non-intractable epilepsy. (Tr.

606).

On June 20, 2018, EMS was called to the scene of a motor vehicle accident, and on

arrival found Lazuka sitting on the pavement next to a police officer. (Tr. 897). He was "pale in

color and was not making any sense when he talked." (*Id.*). Once he arrived at the hospital

Lazuka reported he had not had a seizure in over a year, and when informed he had been

involved in an accident, he did not remember it. (*Id.*). At discharge, Lazuka was diagnosed with

diastolic hypertension, tongue laceration, motor vehicle collision; seizure, polysubstance abuse,

and electrolyte imbalance. (Tr. 836). A brain CT returned normal results. (Tr. 867). He was

given a return-to-work notice for June 21, 2018, and restricted from driving until permitted by a

physician. (Tr. 839).

Lazuka presented to the emergency department on November 7, 2018, with right calf

pain. (Tr. 346). He was given a chest CT which revealed small bilateral pulmonary emboli in the

segmental pulmonary arteries. (Tr. 347). An ultrasound also revealed an acute deep vein

thrombosis ("DVT") of the right lower extremity. (Tr. 348). He was started on anti-coagulants.

(*Id.*). While Lazuka was in the hospital, his wife and mother told doctors that he had been having

seizures more often recently, with the last one occurring about 10 days previously. (Tr. 351). He

had also had episodes of passing out, where his legs give out and he collapses. (*Id.*). Lazuka

admitted he had been "largely noncompliant" with his medications. (Tr. 359). An EEG

performed on November 8, 2018 was interpreted as a "normal awake and sleep EEG. No

epileptiform discharges, EEG seizures, or lateralizing signs are seen." (Tr. 295). At discharge it

was noted that Lazuka had tested positive for THC, benzos, opiates, and oxycodone, and he

admitted to current misuse of oxycodone. (Tr. 371).

On November 21, 2018, Lazuka attended an office visit complaining of right-side chest

pain and shortness of breath. (Tr. 340). He had been started on suboxone and appeared "very

verbose" with "increased anxiety" at times. (*Id.*). He was assessed with pleurisy, pulmonary

embolism, seizure disorder, and opioid dependence with opioid-induced disorder. (Tr. 341).

4

On December 19, 2018, Lazuka was brought by ambulance to the emergency department following a seizure. (Tr. 334). His wife reported finding him in bed seizing, where he was blue, drooping, and apparently choking on his saliva. (*Id.*). He had been confused postictally, but it had resolved by the time he arrived at the hospital. (*Id.*). A CT scan was normal. (Tr. 336).

Lazuka attended a follow up visit for his left calcaneal fracture on December 26, 2018. (Tr. 331). He was assessed with post-traumatic arthritis of the left subtalar joint; left hind foot capsulitis-synovitis; residual ankle equinus; and a history of hypercoagulable state with multiple pulmonary emboli. (*Id.*).

On January 9, 2019, Lazuka attended an office visit with his neurologist, Kristen Smith, M.D. (Tr. 290). He was assessed with focal epilepsy and was noted to have had "prior strokes." (*Id.*)*.* He described his seizure from a few weeks prior as his first since starting on Keppra. (*Id.*). He also suggested he may be having staring spells, and noted that fevers and sleep deprivation have been triggers for his seizures. (*Id.*). On January 31, 2019, Lazuka reported awakening in the morning with episodes of confusion, and felt he may have had a seizure overnight. (Tr. 654). He reported he had been doing a slow up titration of his Keppra dosage. (*Id.*).

At a March 7, 2019 office visit with Dr. Smith, Lazuka reported having three or four seizures since his most recent visit. (Tr. 291). He also described several occasions when he felt a seizure was coming but he was able to continue speaking and the feeling subsided. (*Id.*). He felt his seizures were becoming more frequent, he felt depressed, and was not "his usual jovial, happy self." (*Id.*). He was assessed with focal epilepsy, anxiety, and was noted to have a clotting disorder. (Tr. 292). On March 11, 2019, Lazuka reported having another seizure after starting on Paxil. (Tr. 648).

5

Lazuka presented at the emergency department on March 19, 2019, complaining of left thigh pain he felt was consistent with prior DVTs he had experienced. (Tr. 326). He also believed he may have had a seizure the night before as he woke up feeling confused. (*Id.*). An ultrasound was negative for DVT. (Tr. 328). On March 27, 2019, Lazuka reported experiencing four seizures in the past three weeks. (Tr. 645). He had missed one dose of his anti-seizure medication in early March. (*Id.*). A Digicloud EEG was found to be abnormal and indicative of generalized myoclonic epilepsy. (Tr. 825). On April 10, 2019, Lazuka reported he had been having increased stress, as well as increased seizure frequency. (Tr. 637). His wife stated that she has noticed him twitch which led to a seizure, and she further indicated that his personality is now "flat" and that his thinking appears to be slower. (*Id.*).

On May 1, 2019, Lazuka was brought to the emergency department by ambulance on an initial call for calf pain. (Tr. 701). Upon EMS arrival, Lazuka also complained of chest pain and shortness of breath. (*Id.*). At the emergency department he experienced a witnessed seizure lasting about 30 seconds with virtually no postictal period. (*Id.*).

Examination notes from a May 14, 2019 office visit with Dr. Smith indicated that Lazuka has not done well on several medications, so they were going to try Onfi to gain better control of his mood and seizures. (Tr. 813). On June 19, 2019, Lazuka underwent a primary repair of the right flexor hallucis longus tendon and a full-thickness laceration of the right great toe, and a removal of a retained foreign body. (Tr. 683).

On September 9, 2019, Dr. Smith noted that Lazuka's intractable epilepsy was getting worse despite his medications, and referred him for Vagus Nerve Stimulation ("VNS") therapy. (Tr. 811). Lazuka reported having six seizures within the last two weeks, and that he is aware of some before they start. (*Id.*). The VNS was implanted in October 2019, and the device was

turned on November 12, 2019. (Tr. 809). He returned for a VNS check on January 7, 2020, and noted that although he did have three or four seizures after implantation, he had not had one in a few weeks. (Tr. 933). He and his family agreed that since implantation the seizures that he did have were less violent and, therefore, less disruptive. (*Id.*).

On February 5, 2020, at an office visit with Dr. Smith, Lazuka's family expressed concern that he might have multiple personalities and were concerned that he may be incapable of sitting for a deposition with the F.B.I. as he was under investigation for wire fraud. (Tr. 931). Dr. Smith learned of his history of opioid dependence, so she discontinued his valium prescription. (*Id.*). Lazuka also reported he had been having more seizures that come on quickly but were shorter in duration. (*Id.*). At an April 13, 2020 office visit, Lazuka stated he had not had a seizure since early March, but he was having trouble with his voice due to the VNS, and he has gained significant weight. (Tr. 929).

### C.    Medical Opinion Evidence

#### i.    State Agency Reviewers

On August 3, 2019, state agency reviewing physician Dimitri Teague, M.D., determined that Lazuka had only non-exertional physical limitations. (Tr. 91). Dr. Teague opined that Lazuka was limited to occasional climbing of ramps and stairs but could never climb ladders, ropes or scaffolds; he was limited to frequent balancing; and he must avoid all exposure to unprotected heights and heavy moving machinery. (Tr. 91-92). On December 21, 2019, state agency reviewing physician William Bolz, M.D., adopted the limitations suggested by Dr. Teague and added the additional limitation restricting Lazuka from commercial driving. (Tr. 105).

On August 4, 2019, state agency reviewing psychologist Maria Yapondjian-Alvarado, Psy.D., opined that there were no severe mental health impairments established in the record. (Tr. 89). State agency reviewing psychologist Paul Tangeman, Ph.D. affirmed Dr. Yapondjian-Alvarado's opinion on December 20, 2019. (Tr. 103).

### ii.        Consultative Examiner

On July 8, 2019, Paul Josell, Psy.D., conducted a mental health consultative examination of Lazuka and determined that he did not qualify for a diagnosis. (Tr. 665-67). He opined that there were no limitations in the domains of understanding, remembering, and carrying out instructions; interaction with others; concentration, maintaining persistence and pace; and adaptation. (Tr. 667).

### iii.       Medical Source Statement

On May 14, 2019, Dr. Smith opined that Lazuka was not currently able to work, but she remained hopeful that he could return to work once his seizures were under better control. (Tr. 813). Dr. Smith completed a Seizures Medical Source Statement on May 30, 2019, indicating Lazuka suffers from grand mal seizures that last 5-15 minutes, as well as absence seizures that lasted 30-60 seconds. (Tr. 661). She noted that these happen once or twice weekly, or 4-10 times monthly. (*Id.*). She noted the seizures were generalized in onset without warning. (*Id.*). He rarely has an aura but will bite his tongue and loses control of his bladder. (Tr. 662). Postictally, he experiences confusion, irritability, anger, rage, frustration, and difficulty communicating. (*Id.*). She opined that Lazuka is capable of low stress work and could function normally physically between seizures. (*Id.*). He is capable of working at a light exertional level. (Tr. 663). He does experience associated cognitive and behavioral issues, including short attention span, irritability, memory problems, and behavior extremes. (Tr. 664). Dr. Smith believed that Lazuka would be

absent four times monthly, and she "believes strongly that [Lazuka] is currently not employable due to high frequency of seizures in recent months and the significant behavioral effects of his seizures – causing frontal lobe dysfunction." (*Id.*).

On June 26, 2020, Dr. Smith wrote that she had "reviewed the opinion I offered on 5/30/2019. After review of my previously offered opinion and a review of my current treatment notes, I am now able to affirm that the limitations, in my opinion, continue to be consistent with my patient's current level of functioning." (Tr. 830).

### D.    Administrative Hearing Evidence

Lazuka first testified before an ALJ on August 14, 2020. (Tr. 31-81). He testified that he has not had an active driver's license since he had an accident caused by a seizure in 2018. (Tr. 42-43). He has a high school education and was most recently employed operating his own business just prior to filing for disability. (Tr. 44). He stated that when he was younger, he had been non-compliant with his seizure treatment because he was in denial, and he was trying to hide his seizures from his family. (Tr. 55). He reported that he does not know when he is going to have a seizure, and that for a couple of days after a seizure he cannot think clearly, and he has difficulty speaking. (Tr. 57). From the time in question, around 2018, Lazuka stated he has been having seizures at least once per week, and he could have as many as four in three days. (Tr. 58).

Lazuka further testified that he has been through many cocktails of anti-seizure medications. (Tr. 59). Because he was having side-effects, and his seizures were not controlled, he had a VNS implanted near the end of 2018 or the beginning of 2019. (Tr. 59-60). His doctor is still raising the voltage to get to therapeutic level, which is generally a 12-18-month process. (Tr. 60). He continues to have seizures, but less regularly, with his last one occurring ten days ago, but the one before that was about a month ago prior to that. (Tr. 62). He did have three the prior

month. (*Id.*). He has seen improvement in 2020, but he noted the seizures tend to come in waves. (*Id.*).

Lazuka mentioned that he has had issues with opiates in the past, but he has not used them since he started on suboxone. (Tr. 64). He currently assists his two young daughters with their schoolwork, and he is able to manage his personal hygiene and perform household chores, unless he is recovering from a seizure. (Tr. 66-67). He reports that 50% of his days are normal, and the rest he either has a seizure or is recovering from having one. (Tr. 67). He goes on walks and he stills sees friends and family. (Tr. 68).

Under questioning from his attorney, Lazuka testified that on a bad day he is "completely out of it" and he spends most of his day in bed. (Tr. 69). He also experiences tremors that are not full-blown seizures but cause his body to tense up and sometimes cause him to drop things. (Tr. 70). Those occur daily, and at times he does not even realize it is happening. (*Id.*). He only experiences an aura before a grand mal seizure, and he tends to have those about once per month. (Tr. 70-71). He sometimes bites his tongue or loses control of his bladder during grand mal seizures. (Tr. 72). He believes he is having absence seizures daily. (*Id.*). After a grand mal seizure he is confused and sleeps for a long time. (*Id.*).

The VE, Kenneth Jones, then testified. He classified Lazuka's past work as a sales agent, business services, DOT #251.357-010, SVP 5, light exertion as generally and actually performed; sales representative, vending and coin machines, DOT #275.357-050, SVP 5, light exertion as generally performed, sedentary as actually performed; vending machine repairer, DOT #639.281-014, DOT #639.281-014, SVP 5, medium exertion as generally performed, light as actually performed; and computer systems hardware analyst, DOT #033.167-010, SVP 7, sedentary exertion level as generally and actually performed. (Tr. 74-76). For her first

hypothetical, the ALJ asked the VE to consider an individual of the same age, educational and work history as Lazuka whose limitations are non-exertional only and include restrictions to occasional climbing of ramps and stairs but never climbing ladders, ropes or scaffolds, frequent balancing, and avoiding all exposure to workplace hazards such as unprotected heights and moving mechanical parts. (Tr. 77). Such an individual could perform all of Lazuka's past work, and could also perform work as a cashier II, DOT #211.462-010, SVP 2, light exertion, with 400,000 jobs in the national economy; as a fast food worker, DOT #311.472-010, SVP 2, light exertion, with 3,650,000 jobs in the national economy; and sales attendant, DOT #299.677-010, SVP 2, light exertion, with 295,000 jobs in the national economy. (Tr. 77-78).

For her second hypothetical, the ALJ asked the VE to consider an individual with all of the same limitations as the individual in the prior hypothetical, but who could also perform complex tasks, but not at a production rate pace and not with strict production quotas. (Tr. 78). Such an individual could perform all of Lazuka's past work, as well as the other jobs identified with the first hypothetical. (*Id.*).

For the third hypothetical the ALJ asked the VE to consider all the restrictions of the second hypothetical, but here would also limit the individual to the performance of detailed but not complex tasks, meaning he could perform semi-skilled work, and the individual can adapt to occasional changes in the routine work setting so long as those changes are explained in advance and implemented gradually. (Tr. 78-79). Such an individual could not perform Lazuka's past work but could perform the other jobs indicated in the first two hypotheticals. (Tr. 79). The VE then noted that employers will not tolerate an employee being off task more than 10% of time and would tolerate no more than one absence per month. (*Id.*).

11

Following a District Court remand, Lazuka appeared for a second hearing before a different ALJ on June 27, 2024. (Tr. 976-1014). It was noted at the hearing that there were outstanding medical records being sought from a correctional institution where Lazuka had been incarcerated, (Tr. 980), and that since his release Lazuka had begun working full-time in September 2023, and he was therefore seeking benefits for a closed period. (Tr. 983). Lazuka testified he had been working at Omni Systems since September 18, 2023 as a press operator making labels. (Tr. 986). His employer is unaware of his medical condition, and Lazuka indicated his seizures had been less frequent and he had not experienced a tonic-clonic seizure since April 8, 2023. (Tr. 988). He testified that he took time off from work when he did not feel right and was concerned a seizure could happen at work. (*Id.*).

Lazuka further testified that he is re-establishing care with a neurologist following his release from prison, and while had been taking his medications, he had not been able to refill his prescription and has been without his medications for about a month. (Tr. 990-91). He stated that his "shaking seizures" are happening about once or twice per quarter, or roughly every other month. (Tr. 992). He attributes the decreasing frequency to reduced stress in his life that started when he was serving his prison sentence. (Tr. 993-94). Before going to prison he had been experiencing tonic-clonic seizures monthly. (Tr. 996). The period when he was having seizures most frequently was in 2019 before the VNS was implanted. (*Id.*). While he does feel the VNS helped reduce the frequency of the seizures, Lazuka also felt reduced stress and better sleep habits helped as well. (Tr. 997).

Lazuka also testified to experiencing absence seizures where he feels "a quick jolt." (Tr. 998-99). He hardly notices them anymore, but those who know him may notice, and it sometimes causes him to drop what he is holding. (Tr. 999). He also has experienced staring

spells and has had fainting episodes, although these have not occurred for about two or three years. (Tr. 1001). He admitted to a past addiction to opioids that may have contributed to his seizures, but he has remained clean since 2019. (Tr. 1003).

Following Lazuka's testimony, VE Thomas Nimberger testified. (Tr. 1008-11). It was determined that there was no past relevant work for the VE to consider. (Tr. 1009). For his first hypothetical the ALJ asked the VE to consider a younger individual with at least a high school education and no past relevant work; the individual has no exertional limitations but can only occasionally climb ramps or stairs and never climb ladders, ropes or scaffolds; the individual can frequently balance; the individual must avoid all exposure to workplace hazards such as unprotected heights or moving mechanical parts; the individual can perform detailed, but not complex tasks, meaning the individual is limited to semi-skilled work; the individual cannot perform tasks at a production rate pace or pursuant to strict production quotas; and the individual can adapt to occasional changes in the work setting or duties so long as those changes are explained in advance and gradually implemented. (*Id.*). The VE opined the individual could perform work as a packager, DOT #920.587-018, SVP 2, medium exertional level, with 40,000 jobs in the national economy; as an office cleaner, DOT #323.687-014, SVP 2, light exertional level, with 200,000 jobs in the national economy; and as a marker, DOT #209.587-034, SVP 2, light exertional level, with 129,000 jobs in the national economy. (Tr. 1010).

Under questioning from Lazuka's attorney, the VE opined that if the individual were absent more than four days per month there would be no work in the national economy. (Tr. 1010-11). If the individual were off task 20% of the workday, the VE further opined that there would be no work in the national economy. (Tr. 1011).

13

**IV.**      **The ALJ's Decision**

In his decision dated August 23, 2024, the ALJ made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.

2.      The claimant engaged in substantial gainful activity during the following periods: the 4th quarter of 2023 and the 1st quarter of 2024. (20 CFR 404.1520(b) and 404.1571 *et seq*.).

3.      However, there has been a continuous 12-month period(s) during which the claimant did not engage in substantial gainful activity.

4.      The claimant has the following severe impairments: epilepsy, osteoarthritis of the left foot, status post fracture and open reduction and internal fixation, opioid dependence, and anxiety. (20 CFR 404.1520(c)).

5.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).

6.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: he can occasionally climb ramps or stairs, but can never climb ladders, ropes or scaffolds. He can frequently balance. He must avoid all exposure to workplace hazards such as unprotected heights and moving mechanical parts. He can perform detailed but not complex tasks, meaning he can perform semiskilled work, but not at a production rate pace and not with strict production quotas. He can adapt to occasional changes in work setting or routine, so long as those changes are explained in advance and implemented gradually.

7.      The claimant has no past relevant work (20 CFR 404.1565).

8.      The claimant was born on September 3, 1982, and was 36 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. (20 CFR 404.1563).

9.      The claimant has at least a high school education (20 CFR 404.1564).

10.     Transferability of job skills is not an issue because the claimant does not have past relevant work. (20 CFR 404.1568).

11.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

12.     The claimant has not been under a disability, as defined in the Social Security Act, from December 31, 2018, the date of this decision (20 CFR 404.1520(g)).

(Tr. 14-40).

## V.     Law and Analysis

### A.     Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1.     whether the claimant is engaged in substantial gainful activity;

2.     if not, whether the claimant has a severe impairment or combination of impairments;

3.     if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.     if not, whether the claimant can perform their past relevant work in light of his RFC; and

5.     if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v)[1]; *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

---

[1] The regulations governing DIB claims are found in 20 C.F.R. § 404, *et seq.* and the regulations governing SSI claims are found in 20 C.F.R. § 416, *et seq.*  Generally, these regulations are duplicates and establish the same analytical framework.  For ease of analysis, I will cite only to the relevant regulations in 20 C.F.R. § 404, *et seq.* unless there is a relevant difference in the regulations.

### B.    Standard of Review

This Court reviews the Commissioner's final decision to determine if it is supported by

substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g);

*Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial

evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 587 U.S. 97, 102-

03 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion.'" *Id.*, quoting *Consolidated Edison Co. v. NLRB*, 305

U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position,

the Commissioner's decision cannot be overturned "so long as substantial evidence also supports

the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir.

2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-

weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the

Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d

at 241. This is so because the Commissioner enjoys a "zone of choice" within which to decide

cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that

decision when the Commissioner failed to apply proper legal standards, unless the legal error

was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision

. . . will not be upheld [when] the SSA fails to follow its own regulations and that error

prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v.

Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review

decisions of administrative agencies for harmless error."). Furthermore, this Court will not

uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012).

## VI.    Discussion

Lazuka raises two issues for this Court's review:

1.    Did the ALJ erroneously fail to comply with the Order of Remand by failing to properly evaluate the opinion of the treating neurologist, Dr. Kristen Smith?

2.    Did the ALJ commit harmful error when, at Step Three of the sequential evaluation, he found that Lazuka's seizures did not satisfy the criteria of Listing 11.02 during the relevant closed period of time?

(ECF Doc. 6, p. 1).

### a.    The ALJ erred in failing to comply with the Order of Remand as he did not properly evaluate the opinion of the treating neurologist, Dr. Kristen Smith.

Lazuka contends that the ALJ, despite the mandate provided in the Order of Remand, again failed to adequately consider the factors of supportability and consistency when evaluating the opinion of the treating neurologist, Dr. Smith. (ECF Doc 6, p. 11). Lazuka specifically argues that although the ALJ found Dr. Smith's opinion unpersuasive owing to the lack of reference in the records confirming the frequency of his seizures, this conclusion is contrary to the medical evidence. (*Id.* at p. 12). Lazuka notes several references throughout the record to instances of documented and witnessed seizures as well as EEG testing indicative of generalized myoclonic epilepsy. (*Id.* at pp. 12-13). He further points to the placement of his VNS in October 2019 as support for Dr. Smith's opinion. (*Id.* at p. 13). Lazuka argues that the ALJ failed to build an

17

accurate and logical bridge between the evidence and the ALJ's decision to deny benefits, and therefore did not comply with the mandate of the federal district court in its reversal of the earlier decision. (*Id.* at pp. 14-15).

In response, the Commissioner asserts the ALJ adequately addressed the supportability and consistency of Dr. Smith's opinions and thereby did comply with the mandate contained in the Order of Remand. (ECF Doc. 9, p. 12). Specifically, the ALJ addressed supportability by referencing Dr. Smith's treatment notes that documented seizures occurred at a much less frequent basis than her opinion would suggest. (*Id.* at p. 13). The Commissioner argues that the only witnessed seizures documented were twitching seizures observed by Lazuka's wife, and that Dr. Smith herself did not witness any seizures and generally reported normal findings in her examinations. (*Id.*). Further, Dr. Smith's opinions were identical, even though the second opinion post-dated placement of the VNS by several months and was rendered during a period when Dr. Smith reported Lazuka was doing well and capable of functioning. (*Id.* at pp. 13-14). Finally, Dr. Smith's notes failed to document findings indicative of "significant behavioral effects" from his seizures, nor did Dr. Smith's notes indicate a basis for any exertional limitations. (*Id.* at p. 14).

As to consistency, the Commissioner contends the ALJ wrote that Dr. Smith's notes reported only sporadic seizures with little objective confirmation of their frequency, and this was consistent with the notes of Dr. Maronian prior to placing the VNS, as well as his primary care provider, Dr. Ashraf. (*Id.*). The Commissioner further notes that only one seizure has ever been witnessed by a medical provider throughout the three-year period in question. (*Id.* at pp. 14-15). In the Commissioner's view, Lazuka's argument is merely an attempt to have the court reweigh the medical evidence, an exercise beyond its purview. (*Id.* at p. 15).

18

When the Appeals Council issues a remand order to an ALJ, the ALJ must "take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order." 20 C.F.R. § 404.977(b); *Wilson v. Comm'r of Soc. Sec.*, 783 F. App'x. 489, 496 (6th Cir. 2019). When a remand order contains detailed instructions concerning the scope of the remand and the issues to be addressed, "further proceedings in the trial court or agency from which appeal is taken must be in substantial compliance with such directions; and if the cause is remanded for a specified purpose, any proceedings inconsistent therewith is [sic] error." *Mefford v. Gardner,* 383 F.2d 748, 758 (6th Cir. 1967). ("[T]he failure by an ALJ to follow a remand order from the Appeals Council, even if that failure is allowed to stand by a later Appeals Council ruling, can constitute a reversible error in federal court. This holds true regardless of whether substantial evidence otherwise supports the Commissioner's final decision.").

In the present case, this Court accepted a Joint Stipulation to Remand to Commissioner the first ALJ decision rendered July 27, 2021. (Tr. 1026). Accordingly, the Appeals Council vacated the final decision of the Commissioner to address the hearing decision's failure to adequately evaluate the medical source opinions of Dr. Smith, the treating neurologist. (Tr. 1029-30). The Appeals Council ordered the ALJ to "articulate the persuasiveness of all the medical opinions and prior administrative findings in the case record, including an explanation of how the [ALJ] considered the factors of supportability and consistency (20 C.F.R. 404.1520c)." (Tr. 1029).

The ALJ must "articulate how [he] considered the medical opinions" and "how persuasive [he] find(s) all of the medical opinions." 20 C.F.R § 416.920c; *see Gamble v. Berryhill*, No. 5:16-CV-2869, 2018 WL 1080916 at 5 (N.D Ohio, Feb. 28, 2018). Factors to be

considered include: (1) Supportability; (2) Consistency; (3) Relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) Specialization; and (5) other factors. 20 C.F.R. § 416.920c. Supportability and consistency are considered the two most important factors; therefore, the regulations dictate that the ALJ "will explain" how the supportability and consistency factors were considered. 20 C.F.R. § 416.920c.

In his assessment of Dr. Smith's opinion, the ALJ clearly addressed the factor of supportability. He noted that "[w]hile [Dr. Smith] treated the claimant, the record did not confirm the degree of limitations she described." (Tr. 965). He further added that "the treatment notes did not make mention of such frequent seizures on an ongoing basis and thus there is no support for the finding that the claimant would miss work as frequently as Dr. Smith asserted." (*Id.*). The determination that Dr. Smith's opinion was unpersuasive was clearly driven by discrepancies between her treatment notes and the suggestion in her opinions that Lazuka would suffer significantly more frequent seizures than her treatment notes would support.

This clarity with regard to supportability is not reflected with an equally robust articulation of how the ALJ considered consistency. The only specific reference to consistency is found where the ALJ wrote, "[s]he did not explain, nor did the record support, the basis for any exertional limitations." (*Id.*). This vague intonation to the record does not create the necessary accurate and logical bridge that would allow a subsequent reader to understand how this critical factor was considered.

The Commissioner argues that Dr. Smith's opinion was, in fact, consistent with the findings of two other treating physicians, Dr. Maronian, who placed his VNS, and his primary care physician, Dr. Ashraf. While that may in fact be so, the ALJ did not make any reference in

20

his discussion of consistency to the findings of other doctors or specific evidence in the record that was consistent with Dr. Smith's opinion. This Court is barred from accepting the type of post-hoc rationalization the Commissioner sets forth, as judicial review of agency action is limited to the reasoning employed by the agency and should not take into account its position in litigation. *SEC v. Cherney Corp.*, 332 U.S. 194 (1947). Accordingly, given the lack of articulation regarding the factor of consistency, I must recommend remand on this basis.

        **b.**      **The ALJ did not err at Step Three of the sequential evaluation when he found that Lazuka's seizures did not satisfy the criteria of Listing 11.02.**

Lazuka argues that the evidence established he had experienced the requisite number of seizures to meet Listing 11.02A. (ECF Doc. 6, p. 15). He specifically points to seizures suffered May 1, 2019, July 15, 2019, and throughout September 2019 as support for this contention, and further notes the implantation of a VNS to assist in controlling his seizures and his continuous attempts to treat his seizures with medication. (*Id.*). He further testified that while he had experienced only three or four seizures annually prior to 2018, throughout 2018 and 2019 he was having seizures weekly. (*Id.*). Lazuka also notes that his wife wrote on August 1, 2020, that he could not be left alone with his children because he did not know when he would have a seizure. (*Id.* at p.16). He also referred to several occasions when he reported his seizures to his neurologist, and that he had an EEG that was interpreted as abnormal and indicative of generalized myoclonic epilepsy. (*Id.* at p. 17).

The Commissioner responds that the ALJ specifically noted the portions of Listing 11.02 pertaining to generalized tonic-clonic seizures that require the seizures to occur at least once a month for three consecutive months or at least once every two months for at least four consecutive months with a marked limitation in physical or mental functioning. 20 C.F.R. § 404, Subpart P, Appendix 1, Listing 11.02(A),(C). (ECF Doc. 9, pp. 15-16). The Commissioner

further notes that the ALJ discussed that the evidence failed to document the frequency of seizures adequate to meet the Listing; that there were only sporadic notes of seizures with little objective confirmation of their frequency; and that Lazuka described episodes of feeling "fuzzy," though it was not clear these were actually seizures. (*Id.* at p. 16). The Commissioner argues that the ALJ found significant Lazuka's generally normal findings at physical examinations with no indication of marked physical restrictions, and that the ALJ considered the four "paragraph B" criteria found in 11.02(D)(2)-(5) and found no more than moderate limitations. (*Id.*). The Commissioner provides the litany of evidence the ALJ cited in determining that Lazuka did not meet the Listing, and adds that the ALJ acknowledged Lazuka's EEG findings, evidence from his treating providers regarding his seizure-related complaints, his typically normal neurological findings, and the efficacy of his treatment regimen, including his VNS placement. (*Id.* at pp. 16-17). He also considered Lazuka's confessed "poor life choices," lack of treatment between 2020-2022, and his work activity in assessing whether he met the Listing. (*Id.* at p. 18). Finally, the ALJ considered multiple expert opinions in arriving at his conclusion. (*Id.*).

At Step Three, a claimant has the burden to show that they have an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant meets all of the criteria of a listed impairment, they are disabled; otherwise, the evaluation proceeds to Step Four. 20 C.F.R. § 404.1520(d)-(e); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Rabbers*, 582 F.3d at 653. ("A claimant must satisfy all of the criteria to meet the listing.").

In evaluating whether a claimant meets or equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an

explained conclusion, in order to facilitate meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) (noting that, without such analysis, it is impossible for a reviewing court to determine whether substantial evidence supported the decision). The ALJ "need not discuss listings that the [claimant] clearly does not meet, especially when the claimant does not raise the listing before the ALJ." *See Sheeks v. Comm'r of SSA*, 544 F. App'x 639, 641 (6th Cir. 2013). "If, however, the record raises a substantial question as to whether the claimant could qualify as disabled under a listing, the ALJ should discuss that listing." *Id.* at 641; *see also Reynolds*, 424 F. App'x at 415-16 (holding that the ALJ erred by not conducting any Step Three evaluation of the claimant's physical impairments when the ALJ found that the claimant had the severe impairment of back pain).

"A claimant must do more than point to evidence on which the ALJ could have based his finding to raise a 'substantial question' as to whether he satisfied a listing." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014), quoting *Sheeks*, 544 F. App'x at 641-42. "Rather, the claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing." *Id.* "Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three." *Id.* at 433; *see also Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) (finding harmless error when a claimant could not show that he could reasonably meet or equal a listing's criteria).

Here, Lazuka does no more than point to evidence on which the ALJ could have based his finding to raise a substantial question as to whether he satisfied the listing. Lazuka suggests that he meets the requirements of Listing 11.02(A) or (C), which reads in pertinent part:

11.02 Epilepsy, documented by a detailed description of a typical seizure and characterized by A [or] C:

      A.      Generalized tonic-clonic seizures (see 11.00H1a), occurring at least once a month for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); or

      C.      Generalized tonic-clonic seizures (see 11.00H1a), occurring at least once every 2 months for at least 4 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); and a marked limitation in one of the following:

            1.      Physical functioning (see 11.00G3a); or

            2.      Understanding, remembering, or applying information (see 11.00G3b(i)); or

            3.      Interacting with others (see 11.00G3b(ii)); or

            4.      Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or

            5.      Adapting or managing oneself (see 11.00G3b(iv))

20 C.F.R. § Pt. 404, Subpt. P. App.1.

The ALJ thoroughly and explicitly addressed the evidence he considered in arriving at his conclusion that Lazuka did not meet Listing 11.02(A) or (C). (ECF Doc 9, pp. 15-18). He provided a well-informed conclusion making clear to subsequent reviewers exactly how he reached his determination that the listing was not met. I concur with the Commissioner who suggests that Lazuka's recitation of evidence that he believes supports a finding that the Listing was met amounts to nothing more than an invitation to reweigh the evidence in the case and does not demonstrate in any way that the ALJ's findings relative to the Listing lacked support by substantial evidence. Accordingly, I recommend that the ALJ's determination that Lazuka's seizures did not meet the criteria of Listing 11.02 be affirmed.

**VII.**      **Recommendation**

Because the Administrative Law Judge failed to apply proper legal standards in evaluating the opinion of neurologist Dr. Kristen Smith, I recommend that the Commissioner's

final decision denying Lazuka's application for disability insurance be vacated and that Lazuka's case be remanded for further consideration of Dr. Smith's opinion. The Administrative Law Judge need not reconsider whether Lazuka's seizures satisfy the criteria of Listing 11.02.

Dated: June 17, 2025

Reuben J. Sheperd
United States Magistrate Judge

---

## OBJECTIONS

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

*** 

Failure to file objection within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendations. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard*

*v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act." *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, 2 (W.D. Ky. June 15, 2018) quoting *Howard*. The failure to assert specific objections may in rare cases be excused in the interests of justice. *See United States v. Wandashega,* 924 F.3d 868, 878-79 (6th Cir. 2019).